1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

### EASTERN DISTRICT OF CALIFORNIA

10

11 GLORIA SANDOVAL,                          Case No.  1:12-cv-00235-SKO

12            Plaintiff,              **ORDER REGARDING PLAINTIFF'S COMPLAINT**

13      v.

14 CAROLYN W. COLVIN,
   Acting Commissioner of Social Security,

15
               Defendant.
16
   _____/
17

18                         **INTRODUCTION**

19        Plaintiff Gloria Sandoval ("Plaintiff") seeks judicial review of a final decision of the

20 Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application

21 for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to

22 Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  The matter is

23 currently before the Court on the parties' briefs, which were submitted, without oral argument, to

24 the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

25                       **FACTUAL BACKGROUND**

26        Plaintiff was born in 1954, obtained an associate's degree, and worked as a teacher's aide

27 and cashier.  (Administrative Record ("AR") 115, 133, 150-57, 774-75.)  On November 20, 2006,

28
   _____
   [1] The parties consented to the jurisdiction of the United States Magistrate Judge for all purposes.  (Docs. 9, 19.)

1   Plaintiff filed applications for DIB and SSI, alleging disability beginning on April 8, 2005, due to

2   an enlarged heart, hypertension, arthritis, and ulcers.  (AR 54, 115-17, 132.)

3   **A.      Relevant Medical Evidence**

4         On March 8, 2007, Plaintiff was seen by Greg Hirokaw, Ph.D., for a comprehensive

5   psychiatric evaluation.   (AR 280-85.)   Dr. Hirokaw noted that Plaintiff "reported feeling

6   depressed, anxious, having panic attacks, cries for no reason, has mood swings, worries a lot, and

7   has obsessive compulsive behavior consisting of checking the stove and checking her dog's water

8   bowl frequently."  (AR 280.)  Plaintiff reported a long history of depression and anxiety.  (AR

9   280.)  Plaintiff indicated that her depression and anxiety worsened after her husband died in a car

10  accident in 1994, and that she became suicidal shortly after that time, making two suicide

11  attempts.   (AR 280.)   Plaintiff further reported that her depression and anxiety had recently

12  worsened due to her physical problems, being in pain, tiring easily, and financial issues.  (AR

13  280.)

14        Dr. Hirokaw performed a mental status evaluation, and diagnosed Plaintiff with

15  generalized anxiety disorder, obsessive compulsive disorder, depressive disorder not otherwise

16  specified ("NOS"), and panic disorder without agoraphobia.  (AR 284.)  Dr. Hirokaw noted that

17  Plaintiff "appeared to respond to questions in an open and honest manner.  Her symptoms of

18  depression and anxiety appear to be within the mild range.  Communication skills were fair."  (AR

19  284.)  Dr. Hirokaw's functional assessment indicated that Plaintiff was "mildly limited" in her

20  ability to remember locations and work-like procedures, remember and carry out very short and

21  simple instructions, understand detailed instructions, maintain attention and concentration for

22  extended periods, accept instructions and respond appropriately to supervisors, and act with social

23  judgment and awareness of socially appropriate behavior.  (AR 284-85.)  Dr. Hirokaw further

24  opined that Plaintiff was "mildly limited" in her ability to perform activities within a schedule,

25  maintain regular attendance, be punctual, function independently, sustain an ordinary routine

26  without supervision, complete a normal workday, interact with coworkers and the general public,

27  and be able to withstand the stress of a routine workday.  (AR 285.)  Dr. Hirokaw found that "[t]he

28

likelihood of the claimant emotionally deteriorating in a work environment is minimal."  (AR 285.)

On March 10, 2007, Plaintiff was seen by Rustom Damania, M.D., for a comprehensive internal medicine evaluation.  (AR 286-90.)  Plaintiff complained of pain in both knees since 2005, with arthroscopic surgery on her right knee; bleeding ulcer in May 1996, secondary to aspirin; occasional epistaxis; anemia; congestive heart failure; edema; and dizzy spells.  (AR 286.) Dr. Damania reviewed Plaintiff's medical records, and indicated a past medical history of hypertension; congestive heart failure since 2002 with heavy anemia requiring blood transfusions; either hypothyroid or hyperthyroidism; and migraine headaches since 1985, once a week, associated with vomiting.  (AR 286-87.)  Dr. Damania performed a physical examination, noting that Plaintiff's cardiovascular system sounded normal with no murmurs and no sounds of congestive heart failure; her gait was normal, though she entered the office with a cane due to pain in her knees and dizzy spells; her knee joints extended zero degrees, the flexion was 150 degrees bilaterally, and both knees were tender; her shoulder joints were both tender and she declined to do range of motion testing; and her elbows were tender with flexion-extension of 0-150 degrees, supination of 0-80 degrees, and pronation of 0-80 degrees bilaterally.  Dr. Damania opined that Plaintiff should be able to stand and walk two hours, and sit with no restrictions.  (AR 289.) Plaintiff required a cane at all times because of her knee problems and light-headedness.  (AR 290.)  Plaintiff would be able to lift 10 pounds frequently and occasionally; could not do frequent kneeling, squatting, or crouching; had no definitive manipulative limitations; had no relevant visual impairments; and could not climb or balance due to problems with her knees and dizziness. (AR 290.)

On March 21, 2007, G.W. Bugg, M.D., reviewed Plaintiff's records and performed a physical residual functional capacity ("RFC")[2] assessment.  Dr. Bugg opined that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; could sit, stand and/or walk six

---

[2] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id*.

hours in an eight-hour day; had unlimited push/pull abilities; could frequently balance, stoop, kneel, and crouch, and occasionally climb or crawl; and had no manipulative, visual, communicative, or environmental limitations.  (AR 292-94.)  Dr. Bugg noted that Plaintiff's "[n]eed for [a] cane [was] not supported by [complaints of] discomfort [and] gait disturbances," and found there was "[n]o objective support to support need for assistive device for all ambulation." (AR 297-98.)

On March 23, 2007, E.B. Aquino-Caro, M.D. reviewed Plaintiff's records and performed a mental RFC assessment.  (AR 299-312.)  Dr. Aquino-Caro opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, and had no other significant limitations.  (AR 299-300.)  Dr. Aquino-Caro found that Plaintiff had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.  (AR 310.)

**B.      Lay Testimony**

On January 16, 2007, Plaintiff's daughter Angela Sandoval completed a Third Party Adult Function Report.  (AR 158-65.)  Ms. Sandoval indicated that Plaintiff lived alone.  (AR 158.)  Plaintiff had difficulty getting up due to poor circulation in her feet and legs and arthritis.  (AR 158.)  Ms. Sandoval stated that she witnessed Plaintiff having dizzy spells, which Plaintiff reported occurred three times a week.  (AR 158.)  Plaintiff was unable to stand or walk for too long due to shortness of breath.  (AR 159.)  Plaintiff fed and watered an outside "watch dog" once a day.  (AR 159.)  Ms. Sandoval would take Plaintiff shopping twice a month for groceries.  (AR 161.)  Plaintiff would watch television on a daily basis and crochet.  (AR 162.)  Ms. Sandoval indicated that Plaintiff had trouble with night vision, problems remembering to do and complete tasks, difficulties in concentrating, understanding, and following instructions, and problems using her hands.  (AR 165.)

On August 4, 2011, Ms. Sandoval sent a letter to the administrative law judge ("ALJ").  (AR 765-66.)  Ms. Sandoval indicates that Plaintiff suffered from major depression; nightmares; and physical ailments such as degenerative arthritis, stomach ulcers, lower back pain, migraine

1  headaches, dizzy spells, arm and knee pain, tremors, weakness, thyroid issues; and Parkinson's

2  disease.  (AR 765.)  Plaintiff could no longer drive, and Ms. Sandoval was Plaintiff's "support

3  system."  (AR 765.)

4  **C.       Administrative Hearing**

5         The Commissioner denied Plaintiff's application for disability initially and again on

6  reconsideration; consequently, Plaintiff requested a hearing before an ALJ.  (AR 80-92.)   On

7  August 14, 2009, ALJ Michael Haubner held a hearing in which Plaintiff, represented by counsel,

8  and vocational expert ("VE") Judith Najarian testified.  (AR 767-802.)

9         Plaintiff indicated that she had worked as a cashier and a teacher's aide.  (AR 775-78.)

10  Plaintiff testified that she had difficulties concentrating, could lift and carry five pounds, and could

11  stand for one hour with her cane.  (AR 779-81.)  Plaintiff stated that she had gotten a cane because

12  she "needed it" two years prior, and that she used it 100 percent of the time.  (AR 781.)  Plaintiff

13  could walk for ten minutes before having to sit down, and she elevated her feet all day.  (AR 781.)

14  Plaintiff estimated that she would lie down for five hours during the day.  (AR 782.)

15         The VE testified that Plaintiff's past relevant work was as a teacher's aide and a

16  cashier/checker.  (AR 783.)  The ALJ asked the VE whether a hypothetical person could perform

17  Plaintiff's past relevant work if the person was the same age as Plaintiff; had the same education,

18  language, and background; could lift and carry 50 occasionally and 25 pounds frequently; could

19  stand, walk, and sit six hours in an eight-hour day; had unlimited push/pull ability; could

20  occasionally climb ramps and stairs; could frequently climb ladders, ropes, and scaffolds; could

21  frequently balance, stoop, and kneel, and could occasionally crouch and crawl.  (AR 784-85.)  The

22  VE testified that such a person could perform Plaintiff's past relevant work, as well as work as a

23  sandwich maker, linen room attendant, and machine packager.  (AR 785-86.)  The ALJ asked if

24  the hypothetical person who had the same restrictions, but was moderately limited in her ability to

25  understand, remember, and carry out limited instructions, could perform Plaintiff's past work.

26  (AR 789.)  The VE testified that such a person could not do Plaintiff's past relevant work, but

27  could perform the other jobs identified.  (AR 789-90.)

28

**D.      The ALJ's Decision**

On November 13, 2009, the ALJ issued a decision finding Plaintiff not disabled since April 8, 2005, the alleged disability onset date.  (AR 51-62.)  In relevant part, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since April 8, 2005, the alleged disability onset date; (2) had the following severe impairments: hyperthyroidism, a history of syncope, multiple brain myelomas, headaches, degenerative joint disease of the lumbar and cervical spine, generalized anxiety disorder, obsessive compulsive disorder, depressive disorder, and panic disorder without agoraphobia based on the requirements in the Code of Federal Regulations; (3) did not have an impairment or combination of impairments that met or equaled one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) had the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently, to sit, stand or walk six hours in an eight-hour workday, to occasionally climb and frequently balance, stoop, kneel, crouch, and crawl, had moderate limitations in her ability to understand detailed instructions and, as of February 28, 2008, was precluded from working at unprotected heights, operating automotive equipment, and working around dangerous machinery; (5) was unable to perform past relevant work; (6) was defined as an individual closely approaching advanced age on the alleged disability onset date and subsequently changed age category to advanced age; (7) could perform jobs that exist in significant numbers in the national economy; and (8) had not been under a disability as defined in the Social Security Act since April 5, 2005, through the date of the decision.  (AR 56-62.)

**E.      The Appeals Council Decision**

Plaintiff sought review of the ALJ's decision with the Appeals Council.  (AR 39.)  On September 15, 2011, the Appeals Council issued a decision that was partially favorable to Plaintiff, and held that Plaintiff was entitled to benefits beginning on February 4. 2009.  (AR 20-26.)

The Appeals Council entered additional evidence and arguments into the record.  (AR 24.) The Appeals Council's order noted that Plaintiff had filed a subsequent claim for disability on January 22, 2010, and had been found to be disabled beginning June 1, 2009.  (AR 24.)  As such,

the subsequent decision invaded the time period considered by the ALJ in the instant decision, since the ALJ had found that Plaintiff was not disabled through November 13, 2009, the date of the decision, which was after the June 1, 2009, date from which Plaintiff was later found to be disabled.  (AR 52-62.)  The Appeals Council agreed with the subsequent finding that Plaintiff was disabled as of June 1, 2009, and thus disagreed with the ALJ's finding in the instant decision that Plaintiff was not disabled during the period from June 1, 2009, through November 13, 2009.  (AR 24.)  Further, the Appeals Council reconsidered the instant decision, and determined that Plaintiff should be found disabled as of February 4, 2009, but not before that date.  (AR 24.)

The Appeals Council determined in pertinent part that:

> The record before the Administrative Law Judge include imaging results from June 2009 that show moderately severe degenerative narrowing of the cervical spine at C5-C6 and mild narrowing at C6-C7 . . . . Additional evidence submitted with the request for review also indicates that the claimant has a neurological disorder with mild dementia (report of Sanford Movement Disorder Clinic dated January 1, 2010).  Treatment records show worsening of the claimant's neurological condition. Kathleen Poston, M.D., noted that [Plaintiff's] symptoms had progressed rapidly, especially her gait and balance problems (report of Stanford Advanced Medical Center, dated December 18, 2009).

> The June 2009 imaging results show significant degenerative changes in the cervical spine.  The claimant's condition is progressive is nature.  Accordingly, the Appeals Council finds that the claimant's physical capacity was reduced to the light exertional level as of February 2009, several months before the June 2009 imaging report.

> . . .

> Before February 4, 2009, the claimant was under age 55, which is defined as closely approaching advanced aged.  As of February 4, 2009, the claimant attained age 55, which is defined as advanced age . . . .

> Prior to February 4, 2009, an individual who has the vocational factors described above and who has the residual functional capacity to perform a reduced range at the medium exertional level is found to be not disabled within the framework of Rule 203.22, Table No. 2 of 20 CFR Part 404, Subpart P, Appendix 2.

> For the period beginning February 4, 2009, an individual with the vocational factors described above and who has the residual functional capacity to perform a reduced range of the light exertional level is found to be disabled within the framework of Rule 203.22, Table No. 2 of 20 CFR Part 404, Subpart P, Appendix 2.

AR 25-26.

1   As such, the Appeals Council held that "[b]ased on the application filed on November 30,

2   2006, the claimant became disabled on February 4, 2009, under section 1614(a)(3)(A) of the

3   Social Security Act.  (AR 26.)

4   **F.      Plaintiff's Current Appeal**

5   On January 20, 2012, the Appeals Council approved Plaintiff's request for an extension of

6   time to file an appeal.  (AR 7-8.)  On February 17, 2012, Plaintiff filed the current complaint

7   before this Court seeking review of the ALJ and Appeals Council's decisions.  (Doc. 1.)

8   **SCOPE OF REVIEW**

9   The ALJ's decision denying benefits "will be disturbed only if that decision is not

10   supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

11   601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

12   judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

13   Instead, the Court must determine whether the Commissioner applied the proper legal standards

14   and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

15   *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

16   "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v.*

17   *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

18   relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

19   *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

20   305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

21   the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

22   may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v.*

23   *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

24   **APPLICABLE LAW**

25   An individual is considered disabled for purposes of disability benefits if he is unable to

26   engage in any substantial, gainful activity by reason of any medically determinable physical or

27   mental impairment that can be expected to result in death or that has lasted, or can be expected to

28   last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

1    1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

2    impairments must result from anatomical, physiological, or psychological abnormalities that are

3    demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

4    such severity that the claimant is not only unable to do his previous work, but cannot, considering

5    his age, education, and work experience, engage in any other kind of substantial, gainful work that

6    exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

7          The regulations provide that the ALJ must undertake a specific five-step sequential

8    analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine

9    whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R.  §§

10   404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant

11   has a severe impairment or a combination of impairments significantly limiting her from

12   performing basic work activities.   20 C.F.R. §§ 404.1520(c), 416.920(c).  If so, in the Third Step,

13   the ALJ must determine whether the claimant has a severe impairment or combination of

14   impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20

15   C.F.R. 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step,

16   the ALJ must determine whether the claimant has sufficient residual functional capacity despite

17   the impairment or various limitations to perform her past work.   20 C.F.R. §§ 404.1520(f),

18   416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant

19   can perform other work that exists in significant numbers in the national economy.  20 C.F.R. §§

20   404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the

21   sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99

22   (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

23                                    **DISCUSSION**

24         Plaintiff contends that the Appeals Council's finding regarding Plaintiff's disability onset

25   date is not based on or supported by substantial evidence and the Appeals Council should have

26   obtained evidence from a medical expert to properly determine a disability onset date.  Plaintiff

27   further contends that the pre- and post-February 4, 2009, RFC findings for Plaintiff's physical and

28   mental limitations were not supported by substantial evidence and the resulting hypothetical

1   question posed to the VE was incomplete and inaccurate.  Additionally, Plaintiff asserts that the

2   ALJ improperly discredited Plaintiff's testimony and failed to consider the testimony of the lay

3   witness.  (Doc. 12.)

4       Defendant contends that there was substantial evidence to support the Appeals Council's

5   finding regarding Plaintiff's established disability onset date and that, even if Plaintiff were limited

6   to light work prior to her 55th birthday, the Medical-Vocational Guidelines (the "Grids") directed a

7   finding that Plaintiff was not disabled.  Defendant further asserts that substantial evidence also

8   supported the ALJ's RFC determination, the ALJ properly discredited Plaintiff's credibility, and

9   the ALJ was not required to address the lay witness testimony.  (Doc. 16.)

10  **A.    The Appeals Council's Determination of Plaintiff's Disability Onset Date**

11      The ALJ found that Plaintiff had not been under a disability since April 8, 2005, through

12  the date of the decision on November 13, 2009.  (AR 51-62.)   The Appeals Council noted that

13  Plaintiff had subsequently applied for disability on January 22, 2010, and had been found to be

14  disabled beginning June 1, 2009.  (AR 24.)  Although the subsequent disability determination

15  invaded the period of time of the ALJ's instant decision that Plaintiff was not disabled through

16  November 13, 2009, the Appeals Council agreed with the subsequent finding that Plaintiff became

17  disabled prior to that date.  (AR 24.)  Further, the Appeals Council determined that Plaintiff's

18  physical capacity was reduced as of the date of her 55th birthday, when she reached advanced age,

19  due to the degenerative nature of her condition.  (AR 25.)  As such, it was determined that Plaintiff

20  could only perform light work as of the date she turned 55, and thus became disabled on that date.

21  (AR 25-26.)

22      **1.    Legal Standard**

23      Social Security Ruling ("SSR") 83-20 provides that the Commissioner must establish the

24  onset date of disability.  SSR 83-20.[3]  For onset in disabilities of a non-traumatic origin, medical

25  records containing descriptions of examinations or treatment of the individual are basic to the

26

---

27  [3] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social
    Security Administration has adopted.  20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding precedent

28  upon ALJs.  *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690,
    692 n.2 (9th Cir. 1999).

determination of the onset of disability and serve as the primary element in onset determination. *Id*. "With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.  Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." *Id*.

SSR 83-20 notes that there are times when precise evidence is not available and there may be a need for inferences.

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.  If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

*Id*.

### 2.     The Appeals Council Did Not Properly Establish the Disability Onset Date

The Appeals Council determined that prior to Plaintiff's 55th birthday on February 4, 2009, Plaintiff could "perform a reduced range [of work] at the medium exertional level" and was "not disabled."  (AR 26.)  However, after Plaintiff turned 55, Plaintiff's RFC was "reduced to the light exertional level" and she was found to be disabled.  (AR 25-26.)  The ALJ based this decision upon the June 2009 imaging results that showed "significant degenerative changes in the cervical spine."  (AR 25.)  Noting that Plaintiff's condition was "progressive in nature," the Appeals Council reduced Plaintiff's RFC to the light exertional level as of February 2009, four months prior to the June 2009 imaging results, and determined that Plaintiff was disabled as of February 2009. (AR 25.)

SSR 96-8p defines RFC in pertinent part as follows:

> *Definition of RFC*.  RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related

> symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work- related physical and mental activities . . . . Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.

SSR 96-8p.   An "RFC is not the least an individual can do despite his or her limitations or restrictions, but the most." *Id*.

Further, in determining an RFC, the assessment must be based solely on the claimant's individual impairments. *Id*. "Therefore, in assessing RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments. **It is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the individual had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.).**" *Id*.

Here, based on the finding that the June 2009 imaging results showed that Plaintiff had "significant degenerative changes in the cervical spine," and noting the progressive nature of the degenerative nature, the Appeals Council determined that Plaintiff's RFC was reduced from medium to light exertional levels four months prior, in February 2009, when Plaintiff turned 55 and changed age categories to advanced age.   The Appeals Council did not note any specific medical evidence in the record substantiating this change in February 2009. (*See* AR 25.)  Instead, the determination appears to be an estimate that Plaintiff's condition changed four months prior to the imaging results due to the degenerative nature of the condition and Plaintiff's change in age category.

As noted above, SSR 96-8p provides that a claimant's RFC cannot be determined based upon her age, but must instead be attributable to medically determinable impairments.  Here, there are no medical reports in the administrative record dated on or around February 4, 2009, to support the Appeals Council's finding that Plaintiff's RFC should be reduced from medium to light work. As such, it appears the Appeals Council's decision to find Plaintiff disabled as of February 4, 2009, was based upon Plaintiff's age category and not medical evidence, thereby violating SSR 96-8p.

1    SSR 83-20 controls how the Commissioner establishes a disability onset date.  As noted
2  above, "[h]ow long the disease may be determined to have existed at a disabling level of severity
3  depends on an informed judgment of the facts in the particular case.  This judgment, however,
4  must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should
5  call on the services of a medical advisor when onset must be inferred."  As such, Plaintiff contends
6  that since the Appeals Council could not determine the disability onset date with specificity, the
7  Appeals Council should have a medical advisor to review the records and determine when the
8  onset occurred.  (Doc. 12, 8:22-9:13.)

9    The Ninth Circuit has held that "[i]f the 'medical evidence is not definite concerning the
10  onset date and medical inferences need to be made, SSR 83–20 requires the administrative law
11  judge to call upon the services of a medical advisor and to obtain all evidence which is available to
12  make the determination.'"  *Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 590 (9th Cir.
13  1998) (quoting *DeLorme v. Sullivan*, 924 F.2d 841, 848 (9th Cir.1991)).  In *Armstrong*, the record
14  showed that the plaintiff suffered from various medical impairments, but did not determine when
15  those impairments became disabling.  *Id*.  The Ninth Circuit affirmed that "where a record is
16  ambiguous as to the onset date of disability, the ALJ must call a medical expert to assist in
17  determining the onset date."  *Id*.

18    Defendant relies on *Richardson v. Astrue*, No. 11-CV-1332-LHK, 2012 WL 5904733, at
19  *5 (N.D. Cal. Nov. 26, 2012) for the contention that SSR 83-20 is inapplicable in this case
20  because the SSR 83-20 "contemplates scenarios in which, 'the onset of a disabling impairment(s)
21  occurred some time prior to the date of the first recorded medical examination,' or in which, 'the
22  alleged onset and the date last worked are far in the past and adequate medical records are not
23  available.'"  *Id*.; *see also* Doc. 16, 18:8-13.)  However, SSR 83-20 is not limited to scenarios in the
24  distant past and instead applies "when there is an ambiguity as to the onset date of the disability."
25  *Richardson*, 2012 WL 5904733, at *5.  When such ambiguity exists, "the ALJ must assist the
26  claimant in creating a complete record by inferring an onset date," and such "assistance may
27  require the ALJ to call a medical expert to testify."  *Id*.

28

1    In *Richardson*, there was no need for the Commissioner to require a medical expert's

2  testimony, because the record was "complete and unambiguous" and the medical progression was

3  "well documented."  *Id*.  Further, the medical evidence established the precise date the impairment

4  became disabling.  *Id*.; *see also Sam v. Astrue*, 550 F.3d 808, 810 (9th Cir. 2008) (finding that the

5  procedures proscribed in SSR 83-20 did not apply because the ALJ found that the plaintiff was not

6  disabled at any time through the date of the decision and thus the question of when the plaintiff

7  became disabled did not arise).

8    Here, however, there is a question concerning Plaintiff's disability onset date.  The Appeals

9  Council determined that Plaintiff became disabled during the time period considered in the ALJ's

10  decision.  However, the disability onset date of February 4, 2009, does not appear to be based on

11  specific medical evidence in the record, but instead appears to be based on the Appeals Council

12  retroactively estimating when the degeneration began to take place due to Plaintiff's age, which is

13  not a valid limitation.  *See* SSR 96-8p.  Defendant is required to determine the medical onset date

14  based upon medical evidence, and must do so either by citing to medical evidence in the record

15  that supports the disability onset date or by consulting with a medical advisor.  SSR 83-20.  As

16  such, the Appeals Council failed to properly determine Plaintiff's disability onset date.

17    Finally, Defendant contends that even if Plaintiff had the RFC for light work prior to

18  February 2009, the Grids would have still directed a finding of not disabled given Plaintiff's

19  vocational profile.  (Doc. 16, 19:1-7.)  At Step Five of the sequential evaluation, the burden shifts

20  to the Commissioner to show that the claimant can perform other jobs that exist in the national

21  economy. *Bray v. Comm'r Soc. Sec. Admin*., 554 F.3d 1219, 1222 (9th Cir.2009); *Hoopai v.*

22  *Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).  To meet this burden, the Commissioner "must

23  identify specific jobs existing in substantial numbers in the national economy that [the] claimant

24  can perform despite [his] identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th

25  Cir.1999) (citation and internal quotation marks omitted).

26    There are two ways for the Commissioner to meet this burden: "(a) by the testimony of a

27  vocational expert, or (b) by reference to the Medical Vocational Guidelines ["Grids"] at 20 C.F.R.

28  pt. 404, subpt. P, app. 2."  *Tackett*, 180 F.3d at 1099; *accord Lockwood v. Comm'r Soc. Sec.*

1   *Admin*., 616 F.3d 1068, 1071 (9th Cir. 2010).  However, "[w]hen [the Grids] do not adequately

2   take into account [a] claimant's abilities and limitations, the Grids are to be used only as a

3   framework, and a vocational expert must be consulted."  *Thomas v. Barnhart*, 278 F.3d 947, 960

4   (9th Cir. 2002); *Bray*, 554 F.3d at 1223 n. 4.

5         Here, the Grids do not take into account all of Plaintiff's additional limitations.   The

6   Appeals Council noted that Plaintiff had the RFC to "perform a *reduced range* of light work."

7   (AR 26 (emphasis added)).   The ALJ noted both physical limitations (Plaintiff was limited to

8   "occasional climbing" and was "precluded from working at unprotected heights, operating

9   automotive equipment, or working around dangerous machinery") and mental limitations (Plaintiff

10  had "moderate limitations in her ability to understand detailed instructions").   As such, because

11  there are additional limitations to Plaintiff's RFC that are not accounted for in the Grids,

12  Defendant would be required to provide testimony by a VE setting forth that Plaintiff can perform

13  specific jobs at the light exertional level.   *See Thomas*, 278 F.3d at 960; *Bray*, 554 F.3d at 1223 n.

14  4.  Here, the VE identified medium jobs that Plaintiff could perform of sandwich maker, linen

15  room attendant, and machine packager, but did not identify any jobs at the light exertional level.

16  (AR 62, 785-86.)   As such, the Commissioner has not met the burden of showing that there are

17  jobs in the national economy that Plaintiff can perform.

18        In sum, Defendant is required to determine the medical onset date either by citing to

19  medical evidence in the record that supports the disability onset date or by consulting with a

20  medical advisor.   SSR 83-20.  The Appeals Council failed to do either, and thus failed to properly

21  determine Plaintiff's disability onset date.

22  **B.       The ALJ's Consideration of Medical Evidence**

23        Plaintiff contends that the pre- and post-February 2009 RFC findings were not supported

24  by substantial evidence.   Plaintiff asserts that the ALJ did not properly consider the medical

25  evidence and thus the resulting hypothetical posed to the VE was incomplete and inaccurate.

26  (Doc. 12, 10:14-16:18.)   Defendant contends that the ALJ's RFC determination was supported by

27  substantial evidence.  (Doc. 16, 19:7-25:12.)

28

### 1.     Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id*. Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Id*. If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id*. at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

### 2.     The ALJ Failed to Provide Specific and Legitimate Reasons for Rejecting Physicians' Opinions

Plaintiff asserts that the ALJ did not properly assess Plaintiff's physical limitations. Plaintiff contends that ALJ improperly rejected the opinion of Dr. Damania, "[t]he only physician who personally examined Plaintiff and provided specific opinions regarding her functional limitations," and contends that Dr. Damania's opinions were properly supported by substantial evidence in the record. (Doc. 12, 11:8-9:4.) Plaintiff further contends that the ALJ's reliance on the non-examining state agency physician, Dr. Bugg, was misplaced. (Doc. 12, 11:22-14:4.) Defendant contends that substantial evidence supported the ALJ's decision. (Doc. 16, 19:8-23:5.)

The ALJ assessed the findings of Dr. Damania as follows:

In March 2007[,] the claimant was seen by consultative internist Rustom Damania, M.D., who reviewed the claimant's medical records and conducted an internal medical evaluation.  Dr. Damania diagnosed the claimant with degenerative joint disease of both knees, degenerative joint disease of the shoulders versus bursitis, hypertension, migraine headaches, cardiac problems, hyperthyroidisms, and a history of chronic anemia.  It was the doctor's opinion that the claimant could stand and walk 2 hours out of an 8-hour workday, could sit for an unrestricted period of time, and could lift and carry 10 pounds occasionally and frequently.  He opined the claimant had need of a cane.  Dr. Damania restricted the claimant to frequent kneeling, crouching, and squatting, and she was precluded from climbing or balancing.  He further stated she had some communicative limitations because she was emotional and sad.

. . .

I give little weight to the opinion of Dr. Damania limiting the claimant to a sedentary exertional level, as this is not consistent with the client's essentially normal physical examination before Dr. Damania.  Thus, I give greater weight to the State agency opinion placing the claimant at a medium exertional level with some limitations through September 22, 2008[,] as it is more consistent with the evidence.  However, thereafter, based on the claimant's dizzy spells and syncope, a more restrictive residual functional capacity is appropriate . . .

(AR 59-60)

Accordingly, the ALJ rejected Dr. Damania's opinion because it was inconsistent with the Plaintiff's "essentially normal physical examination."  (AR 59.)

The ALJ, however, does not explain how Dr. Damania's opinion is inconsistent with the examination.  Dr. Damania performed a physical examination of Plaintiff, finding that her gait was normal although she entered the office with a cane due to knee pain and dizzy spells; her knee joints extended zero degrees, the flexion was 150 degrees bilaterally, and both knees were tender; her shoulder joints were both tender and she declined to do range of motion testing; and her elbows were tender with flexion-extension of 0-150 degrees, supination of 0-80 degrees, and pronation of 0-80 degrees bilaterally.  (AR 288.)  Dr. Damania found that "[b]oth shoulders were tender, but no ankyloses or deformities.  Both knees were tender with associated crepitations, but no deformities."  (AR 289.)  While these findings may be construed as "essentially normal" as the ALJ postulates, the findings also show some abnormalities regarding Plaintiff's abilities.

The Ninth Circuit has "held that 'clear and convincing' reasons are required to reject the . . . doctor's ultimate conclusions." *Lester*, 81 F. 3d at 830 (citing *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.1988)).  Further, if a doctor's opinion is contradicted by another doctor, the ALJ "may not reject this opinion without providing 'specific and legitimate reasons supported by substantial

1   evidence in the record."  *Id*.  As such, to reject a physician's opinion, the ALJ must provide an

2   interpretation of the facts and conflicting clinical evidence, and make a finding based on that

3   interpretation.  *See Tommasetti*, 533 F.3d at 1041.  It is improper for the ALJ to set forth

4   conclusions rejecting a doctor's findings without providing an interpretation of the facts. "The ALJ

5   must do more than offer his conclusions. He must set forth his own interpretations and explain

6   why they, rather than the doctors', are correct." *Embrey*, 849 F.2d at 421-22.

7          The Ninth Circuit has found that when a doctor's conclusions are not consistent with his

8   own findings, that is a specific and legitimate reason for rejecting that opinion.  *See Young v.*

9   *Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (per curiam) (treating doctor's conclusory opinion that

10  claimant was disabled was properly rejected by ALJ when it was internally inconsistent and not

11  consistent with doctor's prior medical reports).  However, the ALJ must explain *how* the findings

12  are inconsistent.  The ALJ need not recite the "magic words" of "I reject [a doctor's opinion]

13  opinion about the onset date because . . ."; the court can draw reasonable inferences that exist from

14  the ALJ's opinion, provided that the ALJ "summarized the facts and conflicting clinical evidence

15  in detailed and thorough fashion, stating his interpretation and making findings." *Magallanes v.*

16  *Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).  Here, however, the ALJ has not summarized the facts

17  and conflicting clinical evidence and made his own interpretation.  Instead, he merely indicates

18  Dr. Damania's opinion and notes that it is "not consistent" with the examination.  (AR 59.)

19         "To say that medical opinions are not supported by sufficient objective findings or are

20  contrary to the preponderant conclusions mandated by the objective findings does not achieve the

21  level of specificity our prior cases have required, even when the objective factors are listed

22  seriatim." *Embrey*, 849 F.2d at 421. Here, the ALJ asserts that Dr. Damania's findings of Plaintiff

23  are inconsistent, but fails to explain *how* they are inconsistent. (*See* AR 59.)

24         The Commissioner's opposition brief provides a discussion of how Dr. Damania's opinion

25  was not consistent with the examination; it identifies some of Plaintiff's purportedly "normal"

26  findings and states that Dr. Damania did not cite treatment evidence to support his opinion.  (Doc.

27  16, 22:13-17.)  These reasons, however, were not articulated in the ALJ's decision.  While the

28  Court can draw reasonable inferences from the ALJ's opinion, *Magallanes*, 881 F.2d at 755, the

1    Court cannot consider Defendant's post hoc rationalizations.  The Ninth Circuit has repeatedly

2    emphasized that the "bedrock principle of administrative law" is that a "reviewing court can

3    evaluate an agency's decision only on the grounds articulated by the agency." *Ceguerra v. Sec'y*

4    *of Health & Human Servs.*, 933 F.2d 735, 738 (9th Cir. 1991); *see also Connett v. Barnhart*, 340

5    F.3d 871, 874 (9th Cir. 2003) (noting that a reviewing court is "constrained to review the reasons

6    the ALJ asserts.").  An agency's decision cannot be affirmed on the ground that the agency did not

7    invoke in making its decision. *Pinto v. Massanari,* 249 F.3d 840, 847-48 (9th Cir. 2001).

8        Additionally, the ALJ gives more weight to Dr. Bugg's assessment of Plaintiff's limitations

9    because "it is more consistent with the evidence."  (AR 60.)  Again, the ALJ fails to explain *how*

10   Dr. Bugg's opinion is "more consistent."   Stating that a physician's opinion is consistent or

11   inconsistent with the record is an insufficient reason for accepting or rejecting it.   Mere

12   inconsistency between doctors' opinions does not allow the ALJ to simply select one opinion

13   based solely on the fact that an inconsistency exists.  It is the ALJ's responsibility to address the

14   conflict and explain how the conflict is resolved by assigning weight to differing opinions based

15   on cogent, specific, and legitimate reasons. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595,

16   603 (9th Cir. 1999); *Reddick v. Chater*, 157 F.3d 715, 722, 725 (9th Cir. 1998).

17       Accordingly, the ALJ failed to provide specific and legitimate reasons for rejecting Dr.

18   Damania's opinion and accepting Dr. Bugg's findings.

19       Finally, Plaintiff contends that the ALJ failed to account for her mental limitations.  The

20   ALJ made the following findings regarding Plaintiff's mental condition:

21       The claimant was seen by consultative psychologist Greg Hirokawa in March 2007.
         Dr. Hirokawa stated the claimant was oriented times three, and her memory was
22       intact.  The doctor diagnosed the claimant with generalized anxiety disorder, an
         obsessive compulsive disorder, a depressive disorder, and a panic disorder without
23       agoraphobia.   The doctor estimated that her GAF[4] [Global Assessment of
         Functioning] was 61, which translates to some mild symptoms or some difficulty in
24       social, occupational, or school functioning, but generally functioning pretty well,
         has some meaningful interpersonal relationships . . . .   He stated she only had mild
25       limitations.

26       . . .

---

27   [4]  The GAF scale, also referred to as the Axis V diagnosis, is the consideration of "psychological, social, and
28   occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of
     Mental Disorders 32-34 (4th ed. Text rev. 2000).

1
2
3

> The State agency consulting physician reviewed the claimant's medical records regarding her mental impairments and concluded that the claimant was capable of adapting to work changes, could sustain concentration necessary to complete a task, and could perform simple repetitive tasks.

4

> . . .

5
6
7

> I give little weight to the opinion of Dr. Hirokawa that the claimant had only mild limitations based on her psychiatric evaluation.  In light of the claimant's ongoing treatment with the county mental health provider and their GAF scores showing serious symptoms, the State agency imposition of limitations is more consistent with the evidence.

8    (AR 59-60.)

9    Again, the ALJ made conclusory statements without explaining the specific and legitimate

10   reasons for rejecting certain findings.  Since the ALJ is required to re-examine the medical

11   evidence regarding Plaintiff's physical limitations, the ALJ should also re-evaluate the evidence

12   concerning Plaintiff's mental limitations and explain his reasons for accepting and rejecting certain

13   opinions.

14   **C.      The ALJ's Determination of Plaintiff's Credibility**

15   Plaintiff contends that the ALJ improperly rejected her testimony concerning her

16   impairments and failed to identify specific evidence showing that specific testimony was not

17   credible.  (Doc. 12, 16:19-19:16.)  According to the Commissioner, however, the ALJ found that

18   the record contained substantial evidence to support the ALJ's conclusions.    (Doc. 16,

19   25:13-27:28.)   In considering Plaintiff's credibility, the ALJ found that Plaintiff's "medically

20   determinable impairments could reasonably be expected to cause some of the alleged symptoms.

21   However, the claimant's statements concerning the intensity, persistence and limiting effects of

22   these symptoms are not credible to the extent that they are inconsistent with the [ALJ's] residual

23   functional capacity assessment."  (AR 60.)

24   In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

25   must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First,

26   the ALJ must determine whether the claimant has presented objective medical evidence of an

27   underlying impairment that could reasonably be expected to produce the pain or other symptoms

28   alleged.  *Id.*   The claimant is not required to show that her impairment "could reasonably be

1    expected to cause the severity of the symptom she has alleged; she need only show that it could

2    reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at

3    1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can

4    only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear

5    and convincing reasons" for the rejection.  *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

10   *Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray*,

11   554 F.3d at 1226-27; 20 C.F.R. §§ 404.1529, 416.929.

12   Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably

13   be expected to produce the alleged symptoms.  (AR 60.)  Therefore, absent affirmative evidence of

14   malingering, the ALJ's reasons for rejecting Plaintiff's testimony must be clear and convincing.

15   *Vasquez*, 572 F.3d at 591.

16   Because the Court remands this case for renewed consideration of the medical evidence,

17   the Court dispenses with an exhaustive analysis of the ALJ's assessment of Plaintiff's credibility.

18   Consideration of Plaintiff's credibility is inescapably linked to conclusions regarding the medical

19   evidence.  20 C.F.R. § 416.929.  As such, the re-evaluation of the medical evidence may impact

20   the ALJ's findings as to Plaintiff's creditability.

21   **D.      The ALJ's Consideration of the Third Party Witness**

22   Plaintiff contends that the ALJ failed to properly consider the two statements of Plaintiff's

23   daughter, a third-party witness.  (Doc. 12, 19:17-21:1.)  Defendant asserts that the ALJ provided

24   specific reasons to reject Plaintiff's testimony regarding her limitations, and these reasons were

25   applicable to rejecting the testimony of Plaintiff's daughter.  (Doc. 16, 28:1-16.)

26   Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's

27   ability to work is competent evidence that the ALJ must take into account.  *Nguyen v. Chater*,

28   100 F.3d 1462, 1467 (9th Cir. 1996).  The Ninth Circuit has held that competent lay witness

1    testimony cannot be disregarded without comment, *id.*, and that to discount it, the ALJ "must give

2    reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

3    However, "[w]here lay witness testimony does not describe any limitations not already described

4    by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply

5    equally well to the lay witness testimony, it would be inconsistent with our prior harmless error

6    precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se."

7    *Molina v. Astrue*, 674 F.3d 1104, 1117 (9th Cir. 2012).

8       Because the Court remands this case for renewed consideration of the medical evidence

9    and renewed consideration of Plaintiff's credibility, the Court dispenses with an exhaustive

10   analysis of the two third-party statements made by Plaintiff's daughter.  Consideration of lay

11   testimony is inescapably linked to conclusions regarding the medical evidence. 20 C.F.R.

12   § 416.929.  Further, reconsideration of Plaintiff's credibility may also impact how the ALJ views

13   the third party's statements.  As such, the ALJ should consider the third-party statements in light of

14   the reconsideration of the medical evidence and Plaintiff's statements.

15   **E.     Remand is Warranted**

16      As a general rule, remand is warranted where additional administrative proceedings could

17   remedy the defects in the Commissioner's decision.  *See Harmon v. Apfel*, 211 F.3d 1172, 1179

18   (9th Cir. 2000).  In this case, remand is appropriate for renewed consideration of the disability

19   onset date, medical opinions, and the credibility of Plaintiff and the third party witness.  The ALJ

20   is instructed to take whatever further action is deemed appropriate and consistent with this

21   decision.

22                                 **CONCLUSION**

23      Based on the foregoing, the Court finds that the ALJ's decision is not supported by

24   substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for

25   further proceedings consistent with this order.  The Clerk of this Court is DIRECTED to enter

26   ///

27   ///

28

1  judgment in favor of Plaintiff Gloria Sandoval and against Defendant Carolyn W. Colvin, Acting

2  Commissioner of Social Security.

3

4
   IT IS SO ORDERED.
5

6     Dated:   **September 25, 2013**              **/s/ Sheila K. Oberto**
                                          UNITED STATES MAGISTRATE JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28